**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD J. GOODE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 3967 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | Magistrate Judge Denlow |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Richard Goode ("Plaintiff" or "Goode") was discharged by Defendant American

Airlines Inc. ("American" or "the Airline") on January 3, 2006.  On July 12, 2008, Plaintiff filed

a complaint in which he alleges that his dismissal constituted retaliatory discharge for exercising

his rights under the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/4(h).  After

the close of discovery, American filed a motion for summary judgment [25] pursuant to Rule 56

of the Federal Rules of Civil Procedure.  At the close of briefing on that motion, Plaintiff also

filed a motion for leave to file a sur-reply [43], which the Court grants.[1]  For the reasons stated

below, American's motion for summary judgment [25] also is granted.

**I.      Background**

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1

statements:[2]  Defendant's L.R.  56.1(a)(3) Statement of Material Facts ("Def. SOF") [27],

---

[1]  In ruling on Defendant's motion for summary judgment, the Court considered the arguments raised in
Plaintiff's sur-reply.

[2] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations
be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85
(N.D. Ill. 2000).  The Seventh Circuit has repeatedly confirmed that a district court has broad discretion to
require strict compliance with L.R. 56.1.  See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385

Plaintiff's Response to Defendant's L.R. 56.1(a)(3) Statement of Material Facts ("Pl. Resp. Def. SOF") [32] and Statement of Additional Facts ("Pl. SOAF") [30], and Defendant's Response to Plaintiff's Statement of Additional Facts (Def. Resp. Pl. SOAF) [38].[3]

## A.    Plaintiff's Employment Record at American

Plaintiff began working for American as a Fleet Service Clerk in October 1989.  Pl. Resp. Def. SOF ¶ 7.  Plaintiff's primary responsibility in this position was handling baggage for the Airline, and he served in that capacity up to the date of his termination.  *Id*. ¶ 9.  As a union member, the terms and conditions of his employment were governed by his union's Collective Bargaining Agreement ("CBA") with American as well as the Airline's Rules of Conduct,[4] which apply to all employees, including Fleet Service Clerks.  *Id*. ¶ 4, 8.  Prior to December 2005, Plaintiff reported suffering fifteen injuries on the job, twelve of which caused him either to work light-duty or take time off from work.  *Id*. ¶ 18-19.  Five of these injuries occurred in the

---

F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).  Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement.  See, *e.g.*, *Malec*, 191 F.R.D. at 583.  Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).  Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement – that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact.  See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

[3] Plaintiff argues that the Court should disregard or strike portions of Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment [26] and Defendant's L.R. 56.1 Statement of Material Facts [27] on the ground that Defendant's submissions are legally irrelevant. As noted above, it is the Court's usual practice to disregard improperly supported denials and fact statements as well as immaterial factual assertions, and the Court has done so in this case.

[4] The Rules of Conduct are sometimes referred to as American's "Rules and Regulations."  Def. SOF ¶ 5.

five years immediately preceding Plaintiff's December 4, 2005 injury. Pl. SOAF ¶ 10. Plaintiff also was disciplined by American several times during this period, but neither party suggests that Plaintiff's dismissal was in any way related to his disciplinary record. Pl. Resp. Def. SOF ¶ 10-17.

### B.     The December 4, 2005 Injury

The present claim arises out of a series of events beginning in December 2005 that culminated in Plaintiff's dismissal on January 3, 2006. Pl. SOAF ¶ 1. On December 4, 2005, while he was helping to unload a plane, Plaintiff injured his back in the process of lifting a heavy bag. Def. SOF ¶ 22. Immediately after being injured, Plaintiff reported the incident to his supervisor, who helped Plaintiff complete an online injury form. *Id.* ¶ 23. Plaintiff's supervisor also gave him a copy of the Ground Employee Injury-on-Duty Information Package ("IOD Package"), which explains to injured employees,

> It is your responsibility to accurately convey your physical capabilities to your physician. A completed Physical Capabilities Analysis form (PCAF) is required after your first doctor's visit. You may be requested to provide additional PCAFs during your time away from work due to your injury-on-duty. Once your doctor completes the form, you are responsible to forward it to the AA workers' Compensation Department. Def. SOF ¶ 24.

Under the heading "Assigned Work Restrictions," the Package also instructs the injured employee to "[e]nsure you understand the treating doctor's assigned restrictions and do not exceed them. If asked to perform a task that exceeds your restricts, ask your supervisor to review your restrictions and immediately inform your SRS adjuster." Pl. Resp. Def. SOF ¶ 25. Plaintiff read the IOD Package and signed the last page to indicate that he had done so. *Id.* ¶ 26.

As part of his IOD Package, Plaintiff also received a blank Physical Capabilities Analysis Form ("PCAF") for his doctor to fill out and return (via fax) to American. Deposition of Richard J. Goode ("Goode Dep.") at 269. The PCAF instructs the doctor, in relevant part, that

The physical capabilities you indicate should closely reflect the capabilities of the employee as he/she conveys them to you. [sic] in addition to any further restrictions imposed by you, as part of the treatment and recovery process. * * * Please provide [American] with the specific physical capabilities, even if it is your intent for the employee to remain off work and continue treatment. *Id.* Exh. 24.

Below this statement, the form provides space for the doctor to indicate whether or not the employee can return to work and, regardless of that response, specify what physical movement the employee is capable of performing. *Id.*

### C. Dr. Knight's Examination

The following day, on December 5, 2005, Plaintiff visited the Advocate Medical Group at the Nesset Pavilion where he was examined by Dr. Margaret Knight. Pl. Resp. Def. SOF ¶ 27. Although this was Plaintiff's regular doctor's office, he had never met Dr. Knight prior to this occasion. *Id.* During his examination, Plaintiff gave Dr. Knight the PCAF, which she completed and faxed to American. *Id.* ¶ 28. Dr. Knight indicated that Plaintiff should not return to work. *Id.* ¶ 29. She also provided details about Plaintiff's physical capabilities in the appropriate sections. In the first such section, which asks the doctor to "note how long the individual is capable of [sitting, standing, walking, and driving]," Dr. Knight circled zero (0) hours for all four abilities. Goode Dep. Exh. 24. In the second section, which asked her to "check the maximum limit and frequency" that Plaintiff was capable of lifting or carrying, Dr. Knight drew a single line through the boxes corresponding to "never" for each of the five weight categories (the lowest of which is 1-10 lbs). *Id.* Finally, in the third section, which asked her to check the frequency with which Plaintiff was capable of certain activities, including climbing,

"bending/stooping," "pushing/pulling," and "keyboarding," Dr. Knight drew another vertical line indicating that Plaintiff was "never"[5] capable of all nine activities. *Id.*

Neither party disputes the authenticity of this document; rather, they contest two closely related facts: (1) whether or not Dr. Knight showed Plaintiff what she had written on the PCAF (or otherwise instructed Plaintiff that he was not to engage in any of the activities listed on it); and (2) whether or not the doctor's responses on the PCAF amount to a general proscription from all of the listed activities, even when the employee is not on-the-job. Pl. Resp. Def. SOF ¶ 28-32. Plaintiff maintains that Dr. Knight faxed the form to American without showing him what she had written. *Id.* ¶ 28. In addition, Plaintiff denies that Dr. Knight explained to him at any time that he was not supposed to perform any of the activities listed on the form. *Id.* ¶ 32. Meanwhile, American has produced a declaration from Dr. Knight stating that it was her intention that the restrictions on the PCAF apply generally – not just when Plaintiff was at work – and that Plaintiff had "sustained a severe injury and * * * should generally be bed bound." Declaration of Margaret Knight ¶ 8-9.[6] Dr. Knight also stated that it was her "usual practice to

---

[5]  The other options, besides "never," were "occasionally," "frequently," and "constantly." Goode Dep. Exh. 24. These options correspond to three percentage ranges (1-33%, 34-66%, and 67-100%), which presumably reflect how much the employee can perform the different activities relative to his normal capabilities. *Id.*

[6]  Goode has moved to strike the Declaration of Dr. Knight on the grounds that Dr. Knight was never listed as a witness in any Rule 26 disclosure, that her declaration was not produced prior to the close of discovery (April 27, 2009), and that the "*Ex Parte* communication" between the Defense and a treating physician violates the physician-patient privilege under Illinois law. Pl. Reply in Support of His Motion to Strike 3-8. In response, Defendant produced an e-mail to Plaintiff's attorney dated April 22, 2009 containing an attached subpoena for Dr. Knight to give a deposition on April 24, 2009. Def. Reply Brief Exh. 3. While Dr. Knight's deposition was therefore scheduled to occur before the deadline, the date of Dr. Knight's Declaration, May 19, 2009, falls outside of the April 27 deadline. Plaintiff's argument that Illinois law precludes *ex parte* communication between the Defense and his treating physician is unavailing because there is an explicit exception in the statute for cases brought by the patient in which the patient's physical or mental condition is an issue. 735 ILCS 5/8-802 (4) (2010); see also *Heimann v. Roadway Express, Inc.*, 228 F. Supp. 2d 886 (N.D. Ill. 2002). Since Dr. Knight's Declaration only relates to her examination of Goode and the completion of the PCAF and these facts are at issue, the Court declines to exclude Dr. Knight's Declaration from consideration; nevertheless, the Court also notes that

review forms with patients and to communicate their restrictions to them to enable them to heal from their injuries," but she also revealed that she could not "specifically recall reviewing the form with Mr. Goode." *Id*. ¶ 10.

### D. American's Communications with Plaintiff and Surveillance of His Activities

Beginning on December 5, 2005, the day of Plaintiff's examination by Dr. Knight, Leslie Crowe, an Injury Manager for American, reviewed Plaintiff's injury report and called her supervisor, Debbie Havens, American's Manager of Lost Time and Security, to recommend that American initiate surveillance on Plaintiff. Pl. SOAF ¶ 11, 16, 17. Crowe later explained that she took this action because "it didn't seem to add up to why [Plaintiff] was completely off work from lifting a bag – lifting a heavy bag from the floor and placing it on a cart" and that she was concerned "that the employee was lifting a bag, which he does all the time * * * and then his [PCAF] comes back, and he has that he cannot do anything." *Id*. ¶ 17; Crowe Dep. Tr. at 38:19-40:18.[7] Havens followed Crowe's recommendation and authorized surveillance of Plaintiff. Pl. SOAF ¶ 11. The following day, December 6, Crowe spoke with Plaintiff about his injury and assured him that he would not receive any type of discipline or negative attendance notation for

---

Dr. Knight's statements merely offer speculation as to whether she informed Plaintiff of the capabilities she marked on the PCAF. Particularly in the context of a motion for summary judgment, where the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party," (*Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004), the Court cannot rely on Dr. Knight's statement in its disposition of the current motion because Knight's statement is contradicted by Plaintiff's deposition testimony, in which he states that she failed to show him the completed PCAF form.

[7] Crowe's explanation for the surveillance differs from the reasons stated by Dan Procknow in a subsequent letter to American's Senior Vice President of Airport Services and its Managing Director of Employee Relations. Procknow explained that "[a]s a result of Goode's past ID [injury on duty] history, five ID's in the past five years, surveillance is ordered." Pl. SOAF ¶ 18. American contends that this statement is immaterial because Procknow testified in his deposition that he did not know why surveillance was ordered and that the quotation above was included simply to provide context to the recipients of his e-mail; however, since Procknow was one of three American employees responsible for the decision to discharge Plaintiff, his explanation for the surveillance is pertinent. See Def Resp. Pl. SOAF ¶ 18.

missing work and asked him to let her know how he was doing after his next doctor's appointment. Def. SOF ¶ 33.

American's surveillance of Plaintiff began three days after his injury, on December 7, when Patrick Harrington and Don Eichmann, two members of American's Corporate Security Department, witnessed Plaintiff driving from his home to a gas station and then driving away. *Id.* ¶ 36. Later that week, an investigative company hired by American, Acumen Probe, conducted multiple rounds of surveillance on Plaintiff's apartment on December 10 and 11, but the company's agents did not find Plaintiff's car at his apartment until 10:00 p.m. on December 11.[8] *Id.* ¶ 37. On December 12, Harrington and Eichman again tracked Plaintiff and saw him drive into his apartment parking lot and exit his car carrying a plastic bag. *Id.* ¶ 38.

Plaintiff visited Dr. Knight for a second appointment on December 13, but no new PCAF was completed until December 19. This time, Dr. Knight noted that while Plaintiff was still unable to return to work, he was capable of driving, sitting, standing, and walking eight hours per day. Pl. Resp. Def. SOF ¶ 40; Pl. SOAF ¶ 24; Crowe Affidavit Exh. 3. On December 14, an Acumen Probe investigator saw Plaintiff leave his apartment, place a bag in his car, and drive away at 11:00 a.m. without returning until 3:30 p.m. Def. SOF ¶ 39. On December 16, Plaintiff again spoke with Crowe and reported that he was doing virtually nothing other than watching television and playing on his computer. *Id.* ¶ 34. Plaintiff also reported to Crowe that he was sleeping on the floor because his back was in so much pain. *Id.* In a final conversation with Crowe on December 20, Plaintiff reported that he was "now driving," a statement he admits may

---

[8] Acumen Probe's surveillance report for these days reveals that four separate instances of surveillance were conducted during this period: (1) from 2:00 p.m. to 7:00 p.m. on December 10 as well as (2) 8:30 a.m. to 10:30 a.m., (3) 5:00 p.m. to 6:00 p.m., and (4) 10:00 p.m. to 11:00 p.m. on December 11. Harrington Dep. Tr. Exh. 5 at D000345-346. Plaintiff's car was spotted in the parking lot when the investigator arrived at 10:00 p.m. for the beginning of the fourth period of surveillance. *Id.* at D000346.

have created the impression that there was a period of time prior to this date when he was not driving. *Id.* ¶ 35. Finally, on December 26, an Acumen Probe investigator saw Plaintiff drive from his apartment to a gas station, although by this time it is clear that this activity fell within the capabilities listed on Plaintiff's second PCAF. *Id.* ¶ 40.

### E.     Plaintiff's 29F Conference and Termination

On January 3, 2006, Plaintiff attended a 29F[9] disciplinary conference along with two union representatives and two American employees: Debbie Havens, American's Manager of Lost Time, and Fred Vertrees from Human Resources Operations Support. Def. SOF ¶ 41. After reading Rule 16, American's rule prohibiting misrepresentation of facts, Vertrees launched an extensive period of questioning in which he pressed Plaintiff on the activities he had done in the period following his injury. American and Plaintiff offer materially different descriptions of Plaintiff's behavior during the conference. *See, e.g.* Pl. Resp. Def. SOF ¶ 46. Plaintiff claims that his "story" did not change during the course of the conference; instead, he claims that he disclosed to American all of the driving that he had done during the time that he was absent from work (Pl. Resp. Def. SOF ¶ 44-52) and that American's argument boils down to an assertion that Plaintiff did not tell the truth fast enough. Meanwhile, American asserts that Plaintiff's story about his activities changed as he was being questioned and that his initial statements violated the company's rules against misrepresentation. Def. SOF ¶ 53-56.

---

[9] 29F refers to the section of the Collective Bargaining Agreement between American and Plaintiff's union that concerns disciplinary proceedings. Def. SOF ¶ 42.

Havens's notes from the meeting provide the Court with an uncontested record of Plaintiff's interrogation. See Goode Dep. Exh. 26. Due to the importance of the examination at the Rule 29F conference to the Court's resolution of the issues in this case, the Court quotes extensively from the relevant parts of those notes, especially those sections in which Plaintiff responded to questions about his restrictions:

[In the notes, "F.V." refers to Fred Vertrees while "R.G." refers to Richard Goode.]

\* \* \*

FV:    Going back to the beginning of December \* \* \* you reported an injury on 12/4?

RG:    Right.

FV:    To your lower back?

RG:    Yes. Working the Caadian BTP CTXmachine. It was a Turkish Air bag and was too heavy. When I went to lift it, I hurt my back.

FV:    Did you know the bag was heavy?

RG:    There was a heavy tag on it. I tested it, but it just got to me.

FV:    According to my notes you have injured yourself on other occasions, with at least 5 injuries in the last 5 years, and in fact 3 times now to the lower back. You had a lower back injury earlier this year. Why wouldn't you ask for help?

RG:    We lift heavy bags all he time. It might be heavy for Kevin or Dwight, but not for me.

\* \* \*

FV:    What were your restrictions for this week between December 5th and 13th?

RG:    Nothing. No lifting, no climbing, just relax for a couple of weeks. On the form there was no nothing.

FV:    No driving?

RG:    I could drive.

FV:    Did the Dr. tell you you could drive?

RG:    She didn't say I couldn't.

           (Fred shows [Goode] the PCAF form)

RG:    No – there it says no driving.

           So there it says not driving anytime?

RG:    Right[.]

FV:    Why did the Dr. give you those restrictions?

RG:    Because I was in a lot of pain.

FV:    Did you adhere to those restrictions while you were out?

RG:    Yes I did.

FV:    You didn't do any driving?

RG: Yes, because I didn't see this. The Dr. faxed it over. I didn't look at it when the Dr. filled it out.

FV: You walked out of there not knowing your restrictions? In the packet, you signed the report that it's your responsibility to know your restrictions.

RG: Yes.

FV: Describe what kind of driving you did – at least during the first week.

RG: I really don't think that I did any. To be honest, I just remember watching Satellite TV at that time.

FV: Do you want to think about it some more?

RG: I can't remember – maybe to the grocery store or to pay a couple of bills.

FV: How long were you driving?

RG: Maybe 15 minutes.

\* \* \*

FV: Anywhere else?

RG: No.

FV: Did you visit any friends?

RG: No.

FV: Go to the gas station?

RG: I might have.

FV: Jump back to some other physical restrictions. Doctor said no bending, stooping, sitting, etc. If you couldn't sit, how did you manage to sit in the car for 15 minutes?

RG: I took some Ibuprofen.

FV: Did you do any bending or stooping?

RG: Not that I recall.

FV: Any other sitting other than in the car?

RG: Not that I'm aware of.

FV: What kind of standing were you doing?

RG: What do you mean by standing? I don't understand the line of questioning.

(Break)

\* \* \*

FV: You said earlier that you were basically watching satellite TV. I'm trying to get a clarification on exactly what you were doing.

RG: I don't recall. I don't think I was gone for more than 4 hours. I'm not B/S ing – I don't recall.

FV: Did you spend the night out anywhere?

RG: Isn't that personal? Dwight?

FV: I'm not getting personal. But you weren't gone for more than 4 hours, how would you have spent the night anywhere? Do your kids live in Schaumburg?

RG: No . . .Plainfield.

FV: How far is that by car?

RG: 30-45 minutes.

FV: You don't recall if you went to see your kids, but if you did, that would be longer than 15 minutes.

RG:     Right – if I did. But I don't recall if I did.
FV:     You don't recall if you saw your kids?
RG:     Right – not the first 2 weeks.
FV:     I'm surprised that you don't recall whether you saw your kids during Christmas.
RG:     I'm offended that you asked.  I don't believe in Christmas.  I never saw the form.  I didn't know what the restrictions were.

* * *

FV:     On the 20th [of December], did you speak to the injury manager?
RG:     I believe so.
FV:     Do you recall saying that now I can do some driving?
RG:     Yes.
FV:     Why would you have said that if you've been driving all along?
RG:     That's my personality.  Leslie and I just goof around like that.

* * *

FV:     During the week after your visit on 12/13, did you change what you were doing?  Did you visit or go out of town the second week after the Dr.'s visit on the 13th?  Did any of your activities change?  Did you do more driving?
RG:     I might have.
FV:     * * * Anything else that you remember?
RG:     I do remember on December 12th that I go to school at Harper and that was my sociology final and I did go to take my final.  I took some pain medications and got through it.
FV:     Where is Harper?
RG:     Palatine.  About ten miles from where I live.

* * *

[Goode Provides a written statement]
FV:     I want to ask some questions about your written statement.  You mentioned that you drove.  Is that all the driving you did – pay bills, final exam at Harper.  You mentioned going to the grocery store – is that correct?
RG:     I might have.

* * *

FV:     How long did you drive . . . the length of time in the car?
RG:     Like I said, in Schaumbrg 15 minutes each way.  The first week for sure, but the second week I don't recall.  The first week, I was in a lot of pain.  The second week, if I did go down to visit my kids, I don't know.
FV:     What about the first week?
RG:     No, I don't think so . . . just to the grocery store, to pay some bills.
FV:     You don't recall if you visited your children during those first 2 weeks?
RG:     Yes.
FV:     Did you do anything that you would have been gone for longer than 4 hrs. or an extended period of time.
RG:     Not that I can remember.
FV:     That would include no overnights?

RG: I might have. This is where the company is being intrusive.
FV: I'm not concerned about who you were with. Are you maintaining that you were never away from your apartment for more than four hours at a time?
RG: I could have been. The first week no . . . the second week I might have been.
FV: That second week – where might you have gone?
RG: I could have gone anywhere – to visit my father who has prostate cancer.
FV: Where does he live?
RG: South side of Chicago - [Goode states the location].
FV: Where else might you have gone that second week?
RG: To visit my other child in Berwyn.
FV: If you have visited your father – how long would that drive have taken?
RG: It's right off 294 – maybe ½ hour.
FV: One way?
RG: Yes[.]
FV: And Berwyn – how long one way?
RG: Maybe 20 minutes.
FV: No other possibilities of where you went?
RG: No.
FV: Now some new things are popping up since we first spoke.
RG: It's been a month. I went to visit my father.
FV: In order to get there, you would be sitting.
RG: Yes. And driving which I didn't know about.
FV: You mentioned to the injury manager that "now I can drive, I'm feeling better", [sic] but you were driving all along?
RG: Yes, but the first week was very minimal.
FV: Do you think you misled the injury manager?
RG: No, that's what the Dr. put down.
FV: Do you think that you were leading somewhat of a normal life?
RG: No . . . that's an unfair question.
FV: You went to the gas station.
RG: I might have. You put that out there.
FV: You would have had to pick up a hose to put gas in the car.
RG: I think it's necessary.
FV: Do you think lifting a hose weight more than a pound violates any of your restrictions?
RG: If I think so – no. But if you look at the paper, obviously it does.
FV: How did you take the trash out?
RG: I had to carry it.
FV: Is it a bag or a can?
RG: It's a normal bag.
FV: Something you'd carry outside, down?
RG: Yes . . . I live on the first floor.
FV: Do you think that taking out trash violates your restrictions?
RG: Who else is going to do it for me?

FV: That's not the question. Does it violate your restrictions?

RG: Personally, no, but according to the paper it does.

FV: You went to school on Monday. Harper College in Palatine. How long does it take to get there?

RG: Ten to fifteen minutes.

FV: How long was your final exam?

RG: Maybe a couple of hours.

FV: Were you sitting?

RG: Yes.

FV: Do you think that sitting violated your restrictions?

RG: Yes, but I was in a lot of pain – taking Ibuprofen. It was something that had to be done.

FV: Earlier when I asked you that question you said 45 minutes.

RG: For the actual final.

FV: Where does the 2 hours come from?

RG: I was studying beforehand.

* * *

FV: The Company has concluded the investigation. Before we continue, do you have anything to add?

RG: On December 10th, I drove to take my fiancé to the hospital in Galesburg, Illinois. It's a couple of hours each way.

Following the 29F conference, Vetrees and Havens met with Dan Procknow, American's Human Resources Manager, and together they concluded that Plaintiff had not been truthful or forthright in his responses. *Id.* ¶ 53. There were two grounds for their conclusion: First, they found Plaintiff's statements that he was not aware of his driving restriction inconsistent with his initial understatements of how much he had driven. *Id.* ¶ 54. They reasoned that if it were true that Plaintiff was not aware of his driving restriction, then it would logically follow that he would freely admit that he had driven to all the places he had in fact driven, instead of initially trying to hide those activities. *Id.* Second, Vertrees and Havens did not find it credible that Plaintiff did not initially recall several events, including driving several hours to take his fiancée to the hospital in Galesburg, taking a two-hour final exam, or whether or not he had seen his children at Christmas the previous week. *Id.* ¶ 55.

Later that day, American issued Plaintiff a Final Advisory, which notified him that his employment had been terminated. *Id.* ¶ 59. The Final Advisory stated that the Airline had reached the conclusion that Plaintiff had "regularly violated [his] physical restrictions" and that he had violated company rules 16 and 34, which state:

> \* \* \*
> PERFORMANCE OF WORK
> \* \* \*
> 16. Misrepresentation of facts or falsification of records is prohibited.
> \* \* \*
> PERSONAL CONDUCT
> \* \* \*
> 34. Dishonesty of any kind in relations with the Company such as theft or pilferage of Company property, the property of other employees or property of others entrusted to the Company, or misrepresentation in obtaining employee benefits or privileges will be grounds for obtaining dismissal \* \* \*. Havens Affidavit Exh. 2.

Plaintiff's termination was effective immediately.

On July 12, 2008, Plaintiff filed the present claim for retaliatory discharge under the Illinois Workers' Compensation Act ("IWCA"). Plaintiff also filed a formal workers' compensation claim against American sometime in October 2008, although the exact date is not apparent from either party's statement of facts. See Pl. Resp. Def. SOF ¶ 66; [26] at 1.

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. The Framework for Retaliatory Discharge Claims in the Seventh Circuit

Until recently, retaliatory discharge claims under the Illinois Workers' Compensation Act were complicated by the fact that the Seventh Circuit had refrained from deciding whether to apply the Illinois framework or the more familiar burden-shifting method first presented in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). See *McCoy v. Maytag Corp.*, 495 F.3d 515, 521 (7th Cir. 2007) (declining to decide what the *prima facie* case of retaliation is in the Seventh Circuit); *Carter v. Tennant Co.*, 383 F.3d 673, 678 (7th Cir. 2004) (same); *Bourbon v. Kmart Corp.*, 223 F.3d 469, 476 (7th Cir. 2000) ("Someday we'll have to decide what the *prima facie* case of retaliation is in the Seventh Circuit."). This question remained unanswered

for some time in part because the two frameworks produce similar results; for instance, under both schemes the Court may grant summary judgment when the employer provides a legitimate, non-pretextual reason for the employee's termination. See *Maytag*, 495 F.3d at 522; *Carter*, 383 F.3d at 678 ("Under either standard, [the employee] loses if [the employer] can provide a valid, non-pretextual reason for its decision to terminate [him].").

However, while the present motion was pending, the Seventh Circuit ruled on this issue and determined that "when a retaliatory discharge case governed by Illinois law is litigated in a federal court, the federal court must apply the standard of the state law to a motion for summary judgment, and not the federal standard." *Gacek v. Am. Airlines, Inc.*, --- F.3d ---, 2010 WL 2780318, at *13 (7th Cir. 2010). The Court's decision was rooted in the requirement, under *Erie* and its progeny, that federal courts in diversity cases apply state "substantive" law but federal "procedural" law. See *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); see also, *e.g.*, *Gasperini v. Center for Humanities*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996); *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir. 1994). Because the Illinois Supreme Court made a substantive policy judgment when it rejected the *McDonnell-Douglas* framework in *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 704 N.E.2d 403, 407-08, (Ill. 1998), and because the two standards for a *prima facie* case of retaliation are "materially different," the Seventh Circuit determined that federal courts must apply the Illinois framework. *Gacek*, 2010 WL 2780318 at *4-5, 12-13. The Court proceeds under the Illinois framework.

### B.     The Illinois Framework for Retaliatory Discharge

Under Illinois law, an employee must demonstrate that he was discharged, that the discharge was in retaliation for the employee's activities, and that the discharge violates public policy. *Dotson v. BRP US, Inc.*, 520 F.3d 703, 707 (7th Cir. 2008) (citing *Hartlein v. Illinois*

*Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992)).  For more than thirty years, Illinois courts have recognized that discharge in retaliation for an employee's exercise of workers' compensation violates the public policy of the State.  See *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357-58 (Ill. 1978) ("[R]etaliatory discharge is offensive to the public policy of this State as stated in the Workmen's Compensation Act."); *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 111 (Ill. 2006) (reaffirming the court's statement of Illinois policy in *Kelsay*).  To survive a motion for summary judgment, a plaintiff asserting retaliatory discharge in the workers' compensation context must establish three elements: (1) that he was defendant's employee prior to his injury; (2) that he exercised a right granted to him by the IWCA; and (3) that his discharge was casually connected to his assertion of rights.  See *Dotson*, 520 F.3d at 707; *McCoy*, 495 F.3d at 521; see also *Buzinski v. American Airlines, Inc*., 2010 WL 2340404, at *2 (7th Cir. June 10, 2010).  In the present case, the parties agree that Plaintiff was American's employee prior to his injury, but American submits that Plaintiff cannot establish the second and third elements of the tort.  The Court addresses each of these arguments in turn.

### 1. *Exercising a Right Granted by the IWCA*

American argues that Plaintiff did not exercise a right under the IWCA because he did not file a workers' compensation claim until 2008, more than two years after his termination. But under Illinois law, an employee's formal workers' compensation claim need not precede his termination to satisfy this element.  See *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 913 (Ill. 1988) ("Plaintiff should not be penalized because her employer discharged her in retaliation for orally requesting medical attention, instead of filing a formal compensation claim – the effect is the same: being fired in retaliation for asserting legal rights to medical care for work-related injuries."); *Gacek*, 2010 WL 2780318 at *2-3 ([W]hen he [] first reported the

injury[,] a claim file had been opened by the airline's administrator of workers' claims; and a discharge motivated by such an injury report is a retaliatory discharge under Illinois workers' compensation law."). The second element of the tort merely requires that the employee assert rights under the IWCA.[10] Furthermore, Plaintiff completed an injury report with American on the day of his accident, December 4, 2005 (see Def. SOF ¶ 22), which means that Plaintiff began the process of asserting his IWCA rights *prior* to his termination. *Gacek*, at *2-3;* see also *Bragado v. Cherry Elec. Prods. Corp*., 547 N.E.2d 643, 646 (Ill. App. Ct. 2d Dist. 1989) ("*Hinthorn* also makes it clear that retaliatory discharge can be alleged not only after the employee files a benefits claim, but after she asserts other rights such as seeking medical attention.") (reversed on other grounds by *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565 (Ill. 1998)). Thus, Plaintiff has established that he exercised a right provided to him under the IWCA. See also *Buzinski v. American Airlines*, 2009 WL 1616512, at *4 (N.D. Ill. June 5, 2009) ("[American Airlines] concedes he exercised his rights under the Illinois Workers' Compensation Act even though he was terminated before filing a claim; it presumes Buzinski's injury report creates an inference that he intended to file a workers' compensation claim.").

### 2. Causal Connection to Plaintiff's Discharge

American also argues that Plaintiff fails to establish a causal connection between his discharge and his exercise of IWCA rights. With respect to causation, "the ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein*, 601 N.E.2d at 730. Therefore, a plaintiff must show that his termination was related to his assertion of IWCA rights,

---

[10] Although American suggests that a plaintiff must file a formal workers' compensation claim prior to being discharged, none of the authorities that it cites support that assertion; rather, the decision in each of those cases turned on the causation element of the tort. See, *e.g.*, *Stimely v. Federal Exp. Corp.*, 1996 WL 134259, at *4 (N.D. Ill. March 22, 1996) (following a magistrate judge's recommendation to grant summary judgment because the "Plaintiff failed to show a causal connection between his discharge and his filing of his workers' compensation claim").

which requires either direct evidence or circumstantial evidence of an improper motive. See *Jackson v. Bunge Corp.*, 40 F.3d 239, 242-43 (7th Cir. 1994). If, as in this case, the plaintiff relies on circumstantial evidence, at a minimum he must show that the decision-makers involved in his termination knew that he was filing a workers' compensation claim, seeking medical treatment, or otherwise asserting a right under the IWCA. See *Burgess v. Chicago Sun-Times*, 476 N.E.2d 1284, 1287 (Ill. App. Ct. 1st Dist. 1985) (plaintiff could not show causation because he did not allege that "defendant was informed, or in any way found out, that he was pursuing any remedy under the Workers' Compensation Act."); *Thomas v. Zamberletti*, 480 N.E.2d 869, 871 (Ill. App. Ct. 4th Dist. 1985) ("[T]here is no indication that his employer knew of the reason for his failure to report to work.").[11]

At least one Illinois Court has held that suspicious timing, such as a relatively short period of time between the exercise of one's rights and one's termination, is sufficient to establish a *prima facie* case (*Bragado,* 547 N.E.2d at 646); however, in the context of federal retaliation claims the Seventh Circuit generally requires more than just temporal proximity. See *E.G. Easley v. YMCA of Metro. Milwaukee, Inc.*, 335 Fed.Appx. 626, 632 (7th Cir. 2009); *Andonisamy v. Hewlett-Packard Co.* 547 F.3d 841, 851 (7th Cir. 2008) (finding that suspicious timing along is not enough to create a material issue of fact on summary judgment). Thus, while the Court will consider the length of time between Plaintiff's exercise of rights and his discharge, that factor is not determinative in the present case. American's stated reason for terminating Plaintiff – his dishonesty during the 29F hearing – occurred between his injury and his termination. See also *Stimely v. Federal Express Corp.*, 1996 Wl 134259, at *4-5 (N.D. Ill. Mar.

---

[11] When determining issues under Illinois law, the Court applies the law that would be applied in this context by the Illinois Supreme Court. *Green v. J.C. Penney Auto, Ins. Co.,* 806 F.2d 759, 761 (7th Cir. 1986). The Court is also obliged to consider the holdings of state appellate courts, but it is not bound to follow them if it has good reasons to diverge from them. *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1301 (7th Cir. 1995)

22, 1996).  If the Court were to follow Plaintiff's suggestion that temporal proximity alone is enough, then American's employees would be immunized from any misconduct or violations of American's rules, including the rule against lying to the employer (which, in recent months, repeatedly has been upheld by courts in this district and the Seventh Circuit).  See, *e.g.*, *Gacek*, 2010 WL 2780318, at *2-3; *Buzinski*, 2010 WL 2340404, at *2.

Although the burden to establish the basic features of causation remains with the plaintiff, the defendant can assert that it had a valid basis for firing the employee.  *Clemons*, 184 Ill. 2d at 336; *Dotson*, 520 F.3d at 707; *Hartlein*, 601 N.E.2d at 728.  While "[a]n employer may not discharge an employee on the basis of a dispute about the nature and extent of a compensable injury," there is no *per se* rule prohibiting an employer from firing an employee who has filed for benefits (*Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743, 746 (Ill. App. Ct. 5th Dist. 1998); *Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 127 (Ill. App. Ct. 1st Dist. 2009)); rather, "[a]n employer may discharge an injured employee who has filed a workers' compensation claim as long as the reason for the discharge is wholly unrelated to the employee's claim for benefits under the [IWCA]."  *Clark*, 697 N.E.2d at 746.  Under this standard, an employer is justified in terminating an employee for filing a fraudulent workers' compensation claim (*Hollowell v. Wilder Corp.*, 743 N.E.2d 707, 712 (Ill. App. Ct. 5th Dist. 2001) or for violating a company rule mandating that employees notify the company when they are unable to come to work (*Walker v. Borg-Warner Auto. Automatic Transmission Sys. Corp.*, 88 F. Supp. 2d 878, 880 (N.D. Ill. 2000) ("[Plaintiff's] discharge may have been directly related to her *injury*, but it was not directly related to her *request for benefits*, and that is all that is protected under Illinois law")).

If the defendant provides a valid basis for the plaintiff's termination, the plaintiff may still survive summary judgment by providing evidence that the employer's explanation is mere

pretext – "that the employer did not honestly believe the reasons it gave for its action." *McCoy*, 495 F.3d at 522. This requires more than simply showing that the defendant made a mistake or based its decision on bad policy. *Casanova v. American Airlines*, --- F.3d ----, 2010 WL 3035493, at *3 (7th Cir. 2010) ("A mistake differs from a pretext * * *:  the employer in Clemons was wrong in believing that state law entitled it to defer payment until the next pay period, but as long as the belief was sincere it meant that the plaintiff had not established the required form of causation"). Instead, plaintiff has to provide some evidence that defendant tried to cover up the actual reasons for its actions through lies or deceit. *Id.* at 522-23; *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) ("A pretext for discrimination is something worse than a business error – a lie or deceit designed to cover one's tracks."). In other words, the employee must show that the employer was dishonest. *Casanova*, 2010 WL 3035493 at *3; *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (describing pretext in the Title VII context).

Here, the evidence shows that Plaintiff has met his initial burden of showing that a rational jury could conclude that his termination was related to his assertion of IWCA rights. Plaintiff has established that the American employees[12] responsible for initiating surveillance and terminating him were aware both that he had suffered an injury on duty and that Plaintiff had asserted his IWCA rights by seeking medical attention and reporting his injury to American's third party administrator for workers' compensation benefits. Although suspicious timing alone may be insufficient to establish *prima facie* evidence of causation, the fact that Plaintiff was fired within a month of his injury strongly supports the claim that the two were related, particularly

---

[12] Havens and Crowe decided that surveillance was appropriate and Procknow was at least aware that it had commenced. Havens and Vertrees conducted the 29(F) meeting and then consulted Procknow before the three of them decided to dismiss Plaintiff.

since American began investigating Plaintiff's activities within a day of his injury.  Also, if the issue of pretext is set aside for the moment, all of American's professed reasons for beginning surveillance and terminating Plaintiff are based on a distrust of his integrity with respect to his claims for workers' compensation.

However, American has asserted that it has a valid, non-pretextual reason for dismissing Plaintiff:  he violated two company rules that prohibit misrepresentation.[13]  The Seventh Circuit has held that lying to management is a valid and non-actionable reason to fire an employee.  In *Carter v. Tennant Co.*, the plaintiff claimed he was discharged for filing a workers' compensation claim.  383 F.3d 673, 677 (7th Cir. 2004). The employer maintained that it terminated him for lying on his employment application about previous injuries.  *Id.* at 678.  In affirming summary judgment for the employer, the Seventh Circuit held an employee's dishonesty is a legitimate reason for termination.  *Id*.  Here, as in *Tennant*, American maintains that it terminated Plaintiff not because he asserted his IWCA rights, but because Plaintiff lied in violation of clearly established Company policy.  American Airlines' rules of conduct provide that dishonesty is grounds for immediate dismissal, and recent cases confirm that lying constitutes a valid basis for firing an employee.  See *Buzinski*, 2010 WL 2340404 at *2; *Gacek*, 2010 WL 2780318 at *1.

In his response, Plaintiff argues that the citation to Rule 34[14] means that American terminated him for obtaining a benefit to which he was not entitled and thus his discharge cannot be "wholly unrelated" to his "claim for benefits."  But the citation to Rule 34 does not mean that

---

[13]  Plaintiff's Final Advisory (American's formal statement of termination) states that although Plaintiff was being discharged for the alleged misrepresentations in violation of Rules 16 and 34, American also believed that he "regularly violated [his] physical restrictions."  See Def. SOF ¶ 59; Havens Affidavit Exh. 2.

[14]  Rule 34 states explicitly that misrepresentation in obtaining employee benefits or privileges is immediate grounds for dismissal.  Havens Affidavit Exh. 2.

American terminated him because he exercised his IWCA rights. As the Seventh Circuit pointed out in *Casanova*, Plaintiff is confusing "necessary with sufficient conditions." 2010 WL 3035493 at *3 ("Casanova's claim of injury (which implied that sooner or later he would want workers' compensation benefits) was a necessary condition of the discharge. But it was not a sufficient condition."). American maintains that under either rule, Plaintiff was terminated for violating the company policy against dishonesty. The fact that the alleged dishonesty is related to his injury (he lied about what he was doing while he was off work due to an injury that he sustained while working) does not mean that he was terminated for claiming benefits. See *Walker v. Borg-Warner Auto. Automatic Transmission Sys. Corp.*, 88 F. Supp. 2d 878, 880 (N.D. Ill. 2000) ("[Plaintiff's] discharge may have been directly related to her *injury*, but it was not directly related to her *request for benefits*, and that is all that is protected under Illinois law")).

The disposition of this motion turns on the question of whether there is sufficient evidence for a rational jury to conclude that American's reasons for firing Plaintiff were mere pretext. The parties debate, somewhat tangentially, whether Plaintiff's PCAF represents a set of "work restrictions" or whether the capabilities detailed on the form are meant to reflect a doctor's orders for all hours of the day. See, *e.g.*, Pl. Resp Def. SOF ¶ 25, 30, 46; Def. Resp. Pl. SOAF ¶ 5, 7, 15-17, 20-24. The Court need not determine which interpretation is objectively correct because the crucial question is whether there is enough evidence for a rational jury to conclude that the American employees responsible for discharging Plaintiff did not honestly believe that he had violated American's "zero-tolerance policy" for material lies by its workers. *Casanova*, 2010 WL 3035493 at *3.

Even interpreted in the light most favorable to Plaintiff, the events that occurred between Plaintiff's injury and his termination do not provide a reasonable basis for such a conclusion.[15] American maintains that Plaintiff was fired purely because of the misrepresentations he made during the process of his 29F conference. Vertrees, Havens, and Procknow have stated that they thought that Plaintiff's answers during the 29F were not credible in two respects: First, they thought that Plaintiff's statement that he was not aware of his driving restriction was inconsistent with his initial understatements of how much he had driven. Second, they thought it incredible that Plaintiff did not initially recall driving several hours to take his fiancée to the hospital in Galesburg, taking a two-hour final exam, or whether or not he had seen his children the previous week. Def. SOF ¶ 54-55.

The Court concludes that even considered in a light most favorable to Plaintiff, the notes from the 29F conference, taken in conjunction with the depositions of Plaintiff and the decision-makers, do not provide a basis for finding that Havens, Vertrees, and Procknow did not honestly believe that Plaintiff had lied during his 29F conference. During the 29F conference, when asked initially about what driving he did the first week, Plaintiff responded, "I really don't think that I did any. To be honest, I just remember watching Satellite TV at that time."[16] Yet, as the conference continued, Plaintiff admitted at least to driving to the grocery store, driving to pay

---

[15]  While the statements of Crowe and Procknow suggest multiple (and perhaps conflicting) reasons for the company's surveillance of Plaintiff – Crowe asserted that she acted on a general suspicion that Plaintiff was exaggerating the extent of his injury; meanwhile, in an e-mail to his superiors, Procknow stated that American had initiated surveillance because Plaintiff had suffered five on-duty injuries – this alone is not enough to show pretext because "Illinois permits employers to use surveillance to test the bona fides of a workers' compensation claim." *Casanova*, 2010 WL 3035493 at *8.

[16]  On December 20, 2005, Plaintiff also reported to Crowe that he was "now driving." Plaintiff admitted during his deposition that this statement implied that there was a period of time prior to this date when he was not driving, although it came to light during the conference that there was only a short period of time – as few as two days – that he was not driving, and at no point did he think he was restricted from driving. See Goode Dep. at 322.

some bills, driving to get gas, driving his fiancée to Galesburg Hospital (approximately 200 miles each way) for a medical emergency on December 10, and driving to sit for an exam on December 12 (the day before his second doctor's appointment related to the back injury). Although by the end of conference the decision-makers felt fairly confident that they had gotten the whole story out of Plaintiff, it was within the decision-makers' discretion to determine that, under a zero-tolerance policy, his initial misrepresentation ("I really don't think that I did any. To be honest, I just remember watching Satellite TV at that time") was sufficient to constitute a violation of American's rules against lying, particularly when the truth came on the heels of Vertrees' probe, "Do you want to think about it some more?"[17]

Plaintiff also claims that because Vertrees admitted to having all the information regarding Plaintiff's driving activities at the end of the 29F investigation, Plaintiff did not violate the rules against dishonesty. However, Plaintiff was terminated because his continuously changing story regarding his activities during the 29F conference led the decision-makers to believe that he was being dishonest. Resp. to DSF ¶¶ 54-56.

At the end of the day, Plaintiff's transgression – at least one initial misrepresentation, followed by the gradual release of additional information regarding his driving habits during December – may not be as egregious as those of plaintiffs in other, recent cases that are similar to the case at hand.[18] However, in order to find pretext, a jury would have to determine that the

---

[17]    The decision-makers also took issue with Plaintiff's initial statement that he did not remember whether he had seen his children, who lived in two other towns in the Chicago-area.

[18]    For instance, in *Buzinski v. American Airlines, Inc.*, the plaintiff admitted during his 29F conference that he had lied.  2010 WL 2340404, at *1.  In *Gacek*, a baggage handler who sprained a finger called in sick for several days, during which he was videotaped carrying grocery bags with both hands and not wearing a splint.  2010 WL 2780318, at *1.  He first told American that he had the flu but then changed his story to say he did not come to work because his finger was bothering him, and he was fired for lying. *Id.*  Finally, in *Casanova*, another baggage handler reported a sprained arm (or torn muscle in his shoulder) after which a doctor told him not to use his arm, pending further examination.  2010 WL

decision-makers' conclusion – that Plaintiff had been dishonest – was unworthy of belief, and it is clear from the record evidence that, however fleetingly, Plaintiff did materially misrepresent his driving habits and other post-injury activities at his 29F conference. Had Plaintiff been forthcoming from the outset of the conference that he had been driving, this would be a different case, because even if his restrictions included "no driving," there would be a question of fact regarding the extent to which he was aware of the restrictions.[19] Instead, Plaintiff initially maintained that he did not do any driving, when the truth – as the surveillance revealed and as Plaintiff himself ultimately acknowledged later in the hearing – was that he drove several times during the time between his first and second doctor's appointments, including two lengthy excursions that would have been hard to forget in the short period of time between the first week of his injury and the 29F conference. In these circumstances, Defendant had ample basis to conclude that Plaintiff was not being forthright about his activities since his injury.

Whether Plaintiff in fact was lying, obfuscating, or dissembling is not at issue in this case, nor is there any warrant for the Court to consider the propriety of Defendant's decision to terminate Plaintiff, instead of imposing some lesser form of discipline. The Seventh Circuit frequently has observed that a federal court does "not sit as a super personnel department to review an employer's business decisions." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000); see also *McCoy v. WGN Continental Broadcasting Co.*,

---

3035493, at *1. Yet in a subsequent meeting, an American employee saw Casanova use his left arm to answer his cell phone, and surveillance later showed that he was driving – also against his doctor's orders. *Id*. During his 29F conference, Casanova replied "I don't recall" to most of his questions, although he flatly denied ever using his left hand while he was away from work; then at trial, he confessed that this denial was a lie. *Id.* at *2. In each of these cases, the Seventh Circuit determined that the plaintiff had failed to show pretext and American's discharges of these employees were not contrary to Illinois law.

[19] This also might be a different case if Plaintiff had presented evidence that Defendant had it out for him. But there is no evidence that the decision-makers had a vendetta against Plaintiff or otherwise were out to get him on some other basis or event unrelated to the December 2005 injury and its aftermath.

957 F.2d 368, 373 (7th Cir. 1992). Similarly, the court of appeals has commented that "[i]t is no business of a court in a discrimination case to decide whether an employer demands too much of its workers." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179-80 (7th Cir. 1997); see also *McCoy*, 957 F.2d at 373 (explaining that it is not a court's proper concern that an employer may be wrong about its employee's performance, or be too hard on its employee). Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). Here, Plaintiff has failed to offer evidence that the decision-makers did not honestly believe that Plaintiff was in fact being untruthful, which is the reason that they gave for terminating Plaintiff.

## IV.     Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [25] is granted and judgment is entered in favor of Defendant American Airlines and against Plaintiff Richard Plaintiff on his claims of retaliatory discharge under Illinois law.

Dated:  September 20, 2010

_____
Robert M. Dow, Jr.
United States District Judge